# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION** | **MDL DOCKET NO. 1:22-md-03035-STA-jay**<br><br><br>**ALL CASES** |

## CROSS-DEFENDANT NEWPORT GROUP, INC.'S MEMORANDUM IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS AMEC CROSS-PLAINTIFFS' SECOND AMENDED CROSS-COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

LEGAL STANDARD ..............................................................................................3

ARGUMENT ...........................................................................................................3

   I.    AMEC Fails To State A Fraudulent Concealment Claim (Count III)................................3

   II.   AMEC Fails To State A Claim For Civil Conspiracy (Counts IV, V, VI).........................8

   III.  AMEC Fails To State A Claim For Negligent Misrepresentation (Count VII)................12

       A.    The SACC fails to identify any information Newport provided to AMEC, much less information used for a business transaction. .......................................13

       B.    Newport reasonably relied on information from AMEC, not the other way around...........................................................................................................15

       C.    AMEC does not plausibly allege its reliance on any information it received from Newport was justified. .................................................................16

   IV.  AMEC Fails To State A Claim For Aiding And Abetting A Fiduciary Breach (Count X). .........................................................................................................18

CONCLUSION.......................................................................................................20

# **TABLE OF AUTHORITIES**

Cases

*Amir v. AmGuard Ins. Co.*,
    No. 21-12457, 2022 WL 2070389 (E.D. Mich. June 8, 2022) .................................................6

*Appvion, Inc. Ret. Savs. & Emp. Stock Ownership Plan v. Buth*,
    99 F.4th 928 (7th Cir. 2024) ................................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................................................3, 19

*Batten v. Cmty. Tr. & Banking Co.*,
    No. E201700279COAR3CV, 2019 WL 4013719 (Tenn. Ct. App. Aug. 26, 2019) ................15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................................3, 11, 15

*Blake v. Mindshare Techs., Inc.*,
    No. 6:19-cv-02075, 2021 WL 9624582 (N.D. Iowa Mar. 4, 2021) .........................................14

*Briggs & Stratton Power Prods. Grp., LLC v. Osram Sylvania, Inc.*,
    No. W2016-01799- COA-R3-CV, 2017 WL 5992361 (Tenn. Ct. App. Dec. 4, 2017) .............4

*Carroll v. TDS Telecommunications Corp.*,
    No. 1:17-cv-01127-STA-egb, 2017 WL 6757566 (W.D. Tenn. Dec. 29, 2017) ......................9

*Conopco, Inc. v. Allen & Hoshall*, No. 01–2784 Ma/A,
    2003 WL 25682114 (W.D. Tenn. Aug. 22, 2003) ................................................................16

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................................3

*El Camino Resources, LTD v. Huntington Nat. Bank*,
    722 F. Supp. 2d 875 (W.D. Mich. 2010) ..............................................................................19

*EPAC Techs., Inc. v. Thomas Nelson, Inc.*,
    438 F. Supp. 3d 847 (M.D. Tenn. 2018)...............................................................................13

*Hensley Mfg. v. ProPride, Inc.*,
    579 F.3d 603 (6th Cir. 2009)..................................................................................................3

*HomeTrust Bank v. Craine, Thompson & Jones, PC*,
    No. 3:20-cv-00041, 2020 WL 12863034 (E.D. Tenn. July 16, 2020)......................................9

*In re Connor*,
   636 B.R. 507 (Bankr. M.D. Tenn. 2022) ............................................................9, 11

*Kincaid v. SouthTrust Bank*,
   221 S.W.3d 32 (Tenn. Ct. App. 2006) .................................................................8, 9

*King v. Bradley*,
   No. E2021-261-COA-R3-CV, 2022 WL 678568 (Tenn. Ct. App. Mar. 8, 2022) ............passim

*Knott's Wholesale Foods, Inc. v. Azbell*,
   No. 01A-01-9510-CH-00459, 1996 WL 697943 (Tenn. Ct. App. 1996).............................9, 10

*Majestic Building Maintenance, Inc. v. Huntington Bancshares Inc.*,
   864 F.3d 455 (6th Cir. 2017) ....................................................................................3

*Mark IV Enterprises, Inc. v. Bank of Am., N.A.*,
   No. M2017-00965-COA-R3-CV, 2018 WL 3146305 (Tenn. Ct. App. June 26, 2018)......18, 20

*McCarthy v. G.UB.MK Contractors*,
   No 3:14-cv-00472, 2017 WL 1031980 (E.D. Tenn. Mar. 15, 2017)..........................................9

*McNeil v. Nofal*,
   185 S.W.3d 402 (Tenn. Ct. App. 2005) ..................................................................16

*Nebel v. Everett*, No. 3:05-CV-4,
   10, 2006 WL 36885 (E.D. Tenn. Jan. 5, 2006) ........................................................6

*Neitzke v. Williams*,
   490 U.S. 319 (1989) ................................................................................................3

*Pero's Steak & Spaghetti House v. Lee*,
   90 S.W.3d 614 (Tenn. 2002) ...................................................................................4

*PNC Multifamily Capital Institutional Fund XXVI Ltd. Partnership v. Bluff City Community
   Development Corporation*,
   387 S.W.3d 525 (Tenn. Ct. App. 2012) ..................................................................9

*Sanderson v. HCA-The Healthcare Co.*,
   447 F.3d 873 (6th Cir. 2006) ..................................................................................5

*Tekman v. Berkowitz*,
   639 F. App'x 801 (3d Cir. 2016) ...........................................................................16

*Wigley v. Am. Equity Mortgage*,
   No. 15-2473-STA-cgc, 2015 WL 7292562 (W.D. Tenn. Nov. 17, 2015)..................................4

iii

Rules

Federal Rule of Civil Procedure 9 ................................................................................ 4, 5,7, 8

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 3

Other Authorities

Restatement (Second) of Torts § 552 .......................................................................... 14

Restatement (Second) of Torts § 876 .......................................................................... 18

## INTRODUCTION

The Second Amended Cross-Complaint ("SACC"), Dkt. 570, filed by Defendants/Cross-Plaintiffs African Methodist Episcopal Church and African Methodist Episcopal Church Ministerial Retirement Annuity Plan (the "Plan") (collectively, "AMEC" or the "Church") represents their third attempt to hold Defendant/Cross-Defendant Newport Group, Inc. ("Newport") liable for the alleged mismanagement and misappropriation of retirement plan funds by the Church's own employee, Dr. Jerome V. Harris, the long-time Executive Director of the AMEC Department of Retirement Services. During his tenure at the Department of Retirement Services (2000 through mid-2021), Dr. Harris was, by AMEC's own admission, the Plan's trustee responsible for administering and overseeing the Plan. Dkt. 256 ¶ 26 (p. 7). Dr. Harris prepared lengthy reports each year detailing his activities and investment strategy with respect to the Plan, which were distributed to the Church's General Board—i.e., the Church's most senior officers—who never once inquired into Dr. Harris' activities. SACC ¶¶ 20-24. Despite acknowledging that Dr. Harris was the mastermind of the alleged mismanagement and misappropriation of Plan funds, the SACC attempts to shift the Church's own culpability for failing to properly monitor and supervise Dr. Harris for two-plus decades to Newport, a third-party service provider that even AMEC acknowledges never had custody or control over any Plan assets. The Court should reject the Church's latest attempt to foist blame on Newport for an alleged scheme it had no part in.

The SACC attempts to relitigate numerous arguments that the Court already decided in Newport's favor, ***reasserting previously dismissed claims*** that Newport engaged in fraudulent concealment (Count III) and made negligent misrepresentations (Count VII). But even after two additional years of discovery, the SACC still fails to make sufficient allegations to support those claims, and the Court should dismiss them again. Notwithstanding the length of the SACC—

1

which runs 81 pages and comprises 488 numbered paragraphs—nowhere does AMEC allege, for example, that Newport ever: (i) had custody of the Plan's assets; (ii) had authority to invest Plan assets; (iv) was asked by Dr. Harris (or anyone else) to review or opine upon the legality or appropriateness of the allegedly risky Plan investments challenged in the SACC; (iv) intentionally concealed or misrepresented anything to anyone; or (v) received any fees from AMEC except those expressly authorized by Newport's service agreement.

The SACC goes on to allege—for the first time after more than two years of litigation— that Newport was part of sprawling, multi-decade "civil conspiracies" involving Dr. Harris, Robert Eaton, Symetra, and other Cross-Defendants (Counts IV-VI). But AMEC does not come close to making the necessary factual allegations required to state such claims. There are ***zero allegations*** in the SACC that Newport intentionally agreed to conspire with Dr. Harris or anyone else to misappropriate funds from the Plan. Nor do such conspiracy theories against Newport make any sense. The SACC is devoid of allegations as to any rational motive, financial or otherwise, for Newport to participate in such schemes. Indeed, the Church's claim that Newport engaged in lengthy civil conspiracies with Dr. Harris to defraud the Plan is belied by the undisputed fact that ***AMEC has continued to retain Newport, to this day, as a Plan service provider***. The civil conspiracy claims against Newport should be dismissed, and the claim for aiding and abetting a breach of fiduciary duty (Count X) should be dismissed for similar reasons.

In short, AMEC has failed to allege any facts that could support their claims against Newport in Counts III, IV, V, VI, VII, and X of the SACC, and the Court should dismiss those claims with prejudice.

## LEGAL STANDARD

Motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) are an important mechanism for "streamlin[ing] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-327 (1989). Courts act as gatekeepers to ensure that "a plaintiff with a largely groundless claim [not] be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)) (cleaned up).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When applying this standard, a court must first "accept all well-pleaded factual allegations in the complaint as true." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). But, "[f]actual allegations must be enough to raise a right to relief above a speculative level," and a party must provide "more than labels and conclusions"—"a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Majestic Building Maintenance, Inc. v. Huntington Bancshares Inc.*, 864 F.3d 455, 458 (6th Cir. 2017) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

## I.    AMEC Fails To State A Claim For Fraudulent Concealment (Count III)

Count III alleges that Newport fraudulently concealed or suppressed supposedly material facts regarding the Plan's investments from the Church.  SACC ¶ 298.  The SACC, however, fails to plead facts in support of AMEC's claim with the particularity required by Federal Rule of Civil Procedure 9.  While the SACC asserts that Newport acted intentionally, there are simply no facts offered in support.  AMEC's feeble attempt to redirect blame for its own employee's misconduct to everyone but itself fails as a matter of law, and this claim should be dismissed.

Under Tennessee law, fraudulent concealment has four elements: "(1) the defendant had a duty to disclose a known fact or condition; (2) the defendant failed to disclose it; (3) the plaintiff reasonably relied upon the resulting misrepresentation; and (4) the plaintiff consequently suffered injury."  *Briggs & Stratton Power Prods. Grp., LLC v. Osram Sylvania, Inc.*, No. W2016-01799-COA-R3-CV, 2017 WL 5992361, at *11 (Tenn. Ct. App. Dec. 4, 2017) (citations omitted).  This duty on the part of a defendant arises "when (1) there is a fiduciary relationship between the parties; (2) one of the parties has expressly reposed trust and confidence in the other; or (3) the contract is intrinsically fiduciary and calls for perfect good faith. . . . Without a duty to disclose, there can be no fraudulent concealment."  *Id.* at *11-12.  Importantly, Tennessee law provides that "[f]raudulent concealment requires proof of [a defendant's] ***actual knowledge***[.]"  *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 625 (Tenn. 2002) (emphasis added).  A defendant's mere negligence is insufficient to support a fraudulent concealment claim.

Additionally, "fraudulent concealment must be pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure."  *Wigley v. Am. Equity Mortgage*, No. 15-2473-STA-cgc, 2015 WL 7292562, at *6 (W.D. Tenn. Nov. 17, 2015) ("Above all, Rule 9 provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  To satisfy Rule 9's heightened pleading standards, a plaintiff must specifically

4

allege "the who, what, when, where and how" of the fraud, including facts as to "the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (citations and internal quotation marks omitted). The SACC comes nowhere close to meeting these pleading standards.

As a threshold matter, simply declaring that Newport "concealed that Harris and/or Eaton were making risky investments and engaging in prohibited transaction" is not enough. SAC ¶ 298(b). Such conclusory allegations are antithetical to the particularity required by Rule 9. Rather, AMEC must allege specific facts showing Newport actually ***knew*** Dr. Harris and Robert Eaton were engaging in prohibited conduct or making risky investments, **and explain when and how such knowledge arose**.

But even assuming Newport possessed some knowledge about the Plan's investments, that alone is insufficient. Proving fraudulent concealment requires establishing a ***duty*** of disclosure, and AMEC fails to provide a basis for imposing that duty on Newport. AMEC's failure in this regard is unsurprising. As the Church knows, Newport was not engaged to act as the Plan's investment advisor, and the service agreement between the Church and Newport ("Service Agreement") makes it patently clear that Newport had no duty to investigate or corroborate investment information it received from AMEC. *See* Dkt. No. 100-3 at PAGEID 970-71 ("[Newport] will assume all employee and asset data provided by the company to be accurate and thus we have no responsibility to make independent investigation to corroborate such information[] . . . [W]e are not retained as Trustee or Plan Administrator, nor are we retained for any investment advice. Therefore, we will not be responsible for determining whether the Plan's

5

investments may cause the Plan to enter into a prohibited transaction.").[1]  Declaring, in conclusory fashion no less, that Newport had a disclosure duty "as the third-party administrator," SACC ¶ 301(c), cannot be squared with reality.  If anything, Dr. Harris—the Plan's trustee and the person the Church continually elected to oversee and report on the Plan's investments—had the responsibility to decide what and when to disclose to the Church.

These failures aside, nothing in the SACC plausibly suggests that Newport *intended* to deceive the Church (or anyone else for that matter).  In fact, there are no factual allegations that Newport intentionally concealed any information from the Church whatsoever.[2]  AMEC's fact-

---

[1] The SACC incorporates by reference the terms of the Service Agreement because AMEC: (i) directly references the agreement and lists out the services Newport provided pursuant to it, SACC ¶ 61 ("Harris signed an engagement letter on December 20, 2001 with Newport, outlining the plan administration services to be provided by Newport[.]"), *id.* ¶ 62-66 (listing services provided by Newport pursuant to the contract); and (ii) alleges that Newport had various disclosure obligations in its role as a service provider, *id.* ¶ 301 ("Newport owed a duty [of disclosure] as the third-party administrator[.]").  Accordingly, the SACC affirmatively puts the terms of the Service Agreement at issue given that it purports to describe the scope of Newport's services and responsibilities under the contract.  Moreover, despite two years of discovery, AMEC has yet to identify any other contract, amendments, or modifications that govern its relationship with Newport vis-à-vis the Plan.  The Court should thus consider these contractual terms, despite AMEC's failure to attach the Service Agreement to the SACC.  *See Nebel v. Everett*, No. 3:05-CV-410, 2006 WL 36885, at *1 (E.D. Tenn. Jan. 5, 2006) ("Because [the contract] is (at least ambiguously) referred to in . . . plaintiff's complaint, and because it is central to plaintiff's claims, the court can consider the [contract] in resolving the present [motion to dismiss].").  "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document . . . ."  *Id.* at *1.  The Service Agreement—which is referenced in the SACC and central to the allegations—is not only appropriate for the Court to consider, but it shows that AMEC's allegations are implausible.  *See Amir v. AmGuard Ins. Co.*, No. 21-12457, 2022 WL 2070389, at *7 (E.D. Mich. June 8, 2022) ("[A]lthough a court must generally accept all well-pled facts as true, if a document referenced in the complaint . . . contradicts the factual allegations in the complaint, the document trumps the allegations.") (internal quotation marks omitted).

[2] AMEC's claim that Newport concealed Dr. Harris and Robert Eaton's alleged fraud by "representing and certifying to third parties that Harris was the Trustee" is meritless.  SACC ¶ 298.  In particular, the SAC alleges that the Plan document appointing Dr. Harris as Plan trustee and fiduciary was never effective and, accordingly, the Plan has been without a trustee for the past 20+ years.  *See id.* at PAGEID 9380 n.3.  **In addition to being false, this bizarre claim ignores the SACC's allegations that the Church knew Dr. Harris was making investment decisions with**

free assertions to the contrary do not even make sense in the context of this case.  The **Church**, not Newport, was the source of the information Newport relied upon, and the **Church**, not Newport, was responsible for ensuring its accuracy.  Newport, for instance, had no reason to suspect that anything was amiss because Motorskill "stopped providing quarterly financial statements in December 2019" amid a global pandemic.  *See* SACC ¶ 298(e).  Nor did Newport have any reason to believe this information was being concealed from AMEC—AMEC's own employee was the source of the investment information Newport received.  Fraudulent concealment requires more than mere negligence.  AMEC must plead with particularity that Newport intentionally concealed material facts from the Church.

The SACC's deficiencies in this regard are further underscored by AMEC's failure to even identify, let alone explain, any rational motive on Newport's part.  While AMEC refers to **Dr. Harris's and Robert Eaton's alleged receipt** of Plan money, nothing explains what *Newport* hoped to achieve by engaging in misconduct.  The SACC does not allege, for instance, that Newport received any more money for its services than it was allowed by its contract, which was negotiated and entered into years before any of the misconduct alleged in the SACC.  Nor is there any factual basis to suggest that Newport engaged in fraud to maintain business.  This is fatal to AMEC's claim.  *See* Dkt. 197 at 74 (holding in context of fraudulent concealment claim that Plaintiffs ***must* "allege what Newport gained by omitting information from disclosures it did make to Plaintiff,"** i.e., "allege with Rule 9(b) particularity what [Newport] obtained as a consequence of the alleged fraud") (internal quotation marks omitted) (emphasis added).

---

respect to the Plan's assets—for example, Dr. Harris' annual reports to the AMEC General Board, which discussed the Plan's activities year-to-year.  *See, e.g.*, SACC ¶ 24.

If this were not enough, the entirety of AMEC's fraudulent concealment claim (and indeed, **all** of their claims against Newport) is undercut by a simple reality: it is undisputed that Newport remains a Plan service provider to this very day.  If AMEC truly believed Newport fraudulently concealed information it was required to disclose, its continued reliance on Newport makes no sense.  The Church's efforts to shift blame to Newport for its own lack of oversight are baseless, and this claim should be dismissed.

## II.     AMEC Fails To State A Claim For Civil Conspiracy (Counts IV, V, VI)

Following Plaintiffs' lead, AMEC alleges for the first time that Newport was involved in civil conspiracies with Dr. Harris, Robert Eaton, Symetra, and other Defendants dating back two-plus decades to defraud the Plan.  In particular, the SACC includes three separate civil conspiracy claims: (i) Count IV alleges a conspiracy to engage in conversion; (ii) Count V alleges a conspiracy to intentionally misrepresent information concerning the Plan's investments; and (iii) Count VI alleges a conspiracy to commit constructive fraud.  SACC ¶¶ 305, 336, 369.  Two of AMEC's conspiracy claims are fraud-based claims (Counts V and VI) and, thus, must be pled with particularly under Rule 9.  While the remaining conspiracy claim is not fraud-based (Count IV), it still must be pled with the degree of specificity required by caselaw.  But all three conspiracy claims, which arise out of a common nucleus of facts, are deficient for the same overarching reason: the SACC is devoid of any plausible allegations supporting these wild new conspiracy theories against Newport—let alone allegations that meet the particularity requirement of Rule 9.

To state a civil conspiracy claim, AMEC must establish four elements: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury."  *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

Additionally, a claim for civil conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *In re Connor*, 636 B.R. 507, 519 (Bankr. M.D. Tenn. 2022) (citation and quotation marks omitted). That is because "[p]articipation in a civil conspiracy is not, by itself, an actionable tort. It is a derivative claim, which requires the plaintiff to demonstrate that an underlying predicate tort was allegedly committed pursuant to the conspiracy." *McCarthy v. G.UB.MK Contractors*, No 3:14-cv-00472, 2017 WL 1031980, at * 8 (E.D. Tenn. Mar. 15, 2017) (cleaned up); *id.* ("If the underlying tort is not actionable, the conspiracy claim must also fail."). To plausibly allege a claim of civil conspiracy, AMEC must establish that "the primary purpose of the agreement [is] to cause injury to another; incidental injuries resulting from a pursuit of the parties' own fair interest are not actionable." *Knott's Wholesale Foods, Inc. v. Azbell*, No. 01A-01-9510-CH-00459, 1996 WL 697943, at *5 (Tenn. Ct. App. 1996). While all "[c]onspiracy claims must be plead with some degree of specificity," AMEC is "not excuse[d] [] of any higher burden that may be required for an underlying purpose such as . . . fraud." *Kincaid*, 221 S.W.3d at 38; *Carroll v. TDS Telecommunications Corp.*, No. 1:17-cv-01127-STA-egb, 2017 WL 6757566, at *10 (W.D. Tenn. Dec. 29, 2017).[3] "Conclusory allegations . . . unsupported by material facts will not be sufficient to state such a claim." *Kincaid*, 221 S.W.3d at 38.

The SACC do not come close to meeting this standard. There are zero plausible allegations in the SACC that Newport reached any agreement with Dr. Harris or anyone else to conspire to

---

[3] Accordingly, AMEC was required to plead Counts V and VI with particularity under Rule 9(b). *See HomeTrust Bank v. Craine, Thompson & Jones, PC*, No. 3:20-cv-00041, 2020 WL 12863034, at *6 (E.D. Tenn. July 16, 2020) ("[F]raudulent concealment and constructive fraud are different names for the same cause of action."); *PNC Multifamily Capital Institutional Fund XXVI Ltd. Partnership v. Bluff City Community Development Corporation*, 387 S.W.3d 525, 547-48 (Tenn. Ct. App. 2012) ("This court has noted that there is not a separate cause of action for intentional misrepresentation in Tennessee. Rather, intentional misrepresentation is an element of fraud. However, the two are often used interchangeably in common parlance.") (internal citations and quotation marks omitted).

harm the Plan, much less that the "primary purpose" of Newport's supposed agreement was "to cause injury to another." *Azbell*, 1996 WL 697943, at *5. At best, there are conclusory assertions and innuendos. For example, AMEC baldly asserts that Newport and others "actively participated in a long-running conspiracy to misappropriate, convert, and manage Plan funds for their own benefits" and had a "common design . . . to use their control and influence over a retirement fund" "to the detriment of the Plan and at huge cost to AMEC and the Plan." SACC ¶ 313, 337, 369. But the SACC includes no facts supporting such conclusions. There are *zero* allegations that Newport ever had custody or control over Plan assets—let alone any authority to make decisions with respect to Plan investments. Indeed, it is undisputed that Newport never acted as the Plan's: (i) trustee; (ii) custodian of assets; (iii) investment manager; (iv) investment advisor; (v) accountant; (vi) auditor; or (vii) legal counsel. As Newport's Service Agreement makes clear, Newport's role as the Plan's recordkeeper/third-party administrator involved only the following ministerial tasks: (i) maintaining records of the Plan's income, distributions, and investments; and (ii) preparing quarterly statements reflecting the Plan's value and participant statements reflecting their account balances. Dkt. No. 100-3 at PAGEID 970-71.

Nor are there any allegations that Newport had *actual knowledge* of Dr. Harris and Mr. Eaton's purported scheme. Instead, AMEC repeatedly characterizes Dr. Harris and Mr. Eaton's actions as "suspicious" and hopes that the Court will infer conspiracies on the basis of routine Plan-related administration and communications about the Plan's governing document, expenses, and investments. *See, e.g.*, SACC ¶¶ 34, 94, 148, 178-79, 186, 345, 465. For example, while the SACC alleges that Newport "aided and abetted Harris in receiving 'administrative fees,'" AMEC does not dispute, for instance, that Dr. Harris was entitled to collect certain administrative fees in his role as Plan trustee. Nor does AMEC dispute that, as a Plan service provider, it was common

10

for Newport to communicate with Dr. Harris.  The "obvious alternative explanation" (and, indeed, the more plausible one) is that Newport was simply responding, in good faith, to inquiries from its client contact.  *See Twombly*, 550 U.S. at 567 (noting that factual allegations that are reasonably consistent with lawful conduct fail to state a claim as a matter of law).

AMEC's efforts to fault Newport for not investigating the Plan's investments in Motorskill likewise fall flat.  *See, e.g.*, SACC ¶ 112 (asserting in conclusory fashion that "Newport knew that the valuations of the Motorskill investments were essentially fiction); *id.* ¶¶ 115-130 (faulting Newport for relying on information it received from Dr. Harris and Randall Erwin regarding the Motorskill investments in preparing participant statements).  But Newport was not retained as the Plan's investment advisor and, apart from receiving biannual statements from Motorskill through AMEC's own employee, AMEC does not point to a single piece of information that would have alerted Newport to the supposed "fiction" (much less establish its affirmative consent to participating in that fiction).  *See* Dkt. 100-3 at PAGEID 971 ("[Newport is] not retained as Trustee or Plan Administrator, ***nor are we retained for any investment advice***.") (emphasis added).  Nor was Newport required to undertake its own independent "investigation, questioning, or confirmation."  SACC ¶ 328; *see* Dkt. 100-3 at PAGEID 970 ("[Newport has] no responsibility to make independent investigation to corroborate such information.").  Simply put, Newport was not the Plan's watchdog, and its alleged failure to act as one does not establish deliberate involvement in a conspiracy.  *See In re Connor*, 636 B.R. at 519-20 ("[Plaintiffs] merely allege that Mr. Russell acted on behalf of his client to enforce a detainer warrant and evict the Connors—a lawful purpose

. . . . There is simply no allegation with any degree of specificity that Mr. Russell had a common design with his client or any other person to use unlawful means to evict [plaintiffs].").[4]

Indeed, AMEC's claims of civil conspiracies against Newport do not even make sense. The SACC does not allege, for instance, that Newport received anything other than its contractual fees from AMEC.  Newport had nothing to gain through its supposed involvement in Dr. Harris's alleged misconduct—it would not receive a single penny more than it was already entitled to receive.  An interest in "continued business and flat fees" alone falls well short of establishing motive to participate in a fraudulent scheme.  *Appvion, Inc. Ret. Savs. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024); *see id.* (holding that an interest in "continued business and flat fees, standing alone, typically will not suffice to establish fraudulent intent" because "[a]ll third-party contractors have an interest in retaining the business of their customers, and so any plaintiff could point to that interest") (internal quotation marks omitted).  Moreover, there is no dispute that to this day, ***Newport is still a Plan service provider***.  If Newport truly had been involved in a civil conspiracy with Dr. Harris to misappropriate millions of dollars in retirement plan assets, AMEC obviously would not continue to retain Newport.

In short, the civil conspiracy claims are a baseless attempt to smear Newport's reputation, and the Court should dismiss them.

## III.    AMEC Fails To State A Claim For Negligent Misrepresentation (Count VII)

Count VII of the SACC alleges that Newport "supplied false information" concerning the Plan to AMEC.  SACC ¶ 376.  This is AMEC's third attempt at pleading a negligent

---

[4] Nor does AMEC plausibly allege that "Newport's overt acts" were "in furtherance of the conspiracy," i.e., that Newport took those actions ***with the purpose*** of furthering Dr. Harris' fraudulent scheme.  SACC ¶¶ 322-26, 344-45, 366.  Like Plaintiffs, AMEC has massively overreached in trying to stretch allegations sounding in negligence into a claim that Newport was an active co-conspirator in Dr. Harris' decades-long misappropriation of Plan funds.

misrepresentation claim, and the same issues Newport identified in its prior motions to dismiss persist, namely, that: (i) Newport did not supply information to AMEC meant to guide the Church in its business decisions; (ii) Newport exercised reasonable care in relying on the information it received from AMEC; and (iii) AMEC cannot have justifiably expected Newport to uncover the alleged wrongdoing occurring within AMEC's own ranks.

Accordingly, the Court should dismiss this claim once again. *See* Dkt. 344 at 21 ("AMEC's claim for negligent misrepresentation fails in this case for failure to allege that Newport supplied information to the Church meant to guide the Church in its business transactions.").

### A. The SACC fails to identify any information Newport provided to AMEC, much less information used for a business transaction.

To state a claim for negligent misrepresentation, AMEC must plausibly allege that Newport "supplied information meant to guide [AMEC] in their business decisions." *King v. Bradley*, No. E2021-261-COA-R3-CV, 2022 WL 678568, at *4 (Tenn. Ct. App. Mar. 8, 2022); *EPAC Techs., Inc. v. Thomas Nelson, Inc.*, 438 F. Supp. 3d 847, 856 (M.D. Tenn. 2018) (same). The Court previously dismissed this claim, reasoning that AMEC "fail[ed] to allege that Newport supplied information to the Church meant to guide the Church in its business transactions." Dkt. No. 344 at 21. Instead, AMEC "ma[de] allegations about Newport compiling inaccurate statements for Plan participants and making inaccurate certifications about the Plan's assets to Rodney Brown, a third-party hired to audit the Plan's assets." *Id.* at 21-22. The SACC fails to clear the same hurdle.

AMEC again alleges that Newport "supplied information to AMEC through Rodney Brown & Company" and, "[d]espite not receiving Motorskill Entity quarterly financial statements, [] continued to provide Plan participants with quarterly statements reflecting account balances that included investments in the Motorskill Entities." SACC ¶¶ 242, 376(b). Even assuming Newport provided **<u>Rodney Brown or Plan participants</u>** with false information, however, those allegations

are irrelevant to ***AMEC's*** own claim—AMEC cannot point to false information *others* allegedly received as the basis for its own negligent misrepresentation claim.[5]  *See* MTD Order at 21.

Nor does the generic assertion that Newport "failed to verify" the Plan's investments in Motorskill salvage this claim.  SACC ¶ 378.  AMEC again does not point to any false information Newport supplied the Church with—i.e. the alleged misrepresentations.  Regardless, ***AMEC was responsible for providing accurate information to Newport under the express terms of the Service Agreement***.  *See* Dkt. No. 100-3 at PAGEID 970.  AMEC provided asset information to Newport, which in turn used that information to perform its ministerial duties.  AMEC expressly agreed that Newport would "assume all employee and asset data provided by the [AMEC] to be accurate and thus [Newport] ha[s] no responsibility to make independent investigation to corroborate such information."  *Id.*  AMEC itself recognizes that its own employee, Dr. Harris, supplied information to Newport regarding the Plan's investments.  *See, e.g.*, SACC ¶¶ 122-32.

Similarly, the SACC's bizarre allegation that Newport drafted an inaccurate Plan document does nothing to bolster AMEC's claim.  SACC ¶ 378 ("Newport did not exercise reasonable care or competence in communicating false information to AMEC because, despite being provided with materials evidencing the Church's desire to have more than one individual named as sole Trustee, Newport repeatedly prepared and relied upon documents that listed only Harris as the Trustee.").  Newport did not "misrepresent" Dr. Harris's role as trustee to AMEC (or anyone else for that matter).  Dr. Harris was indisputably the Plan's trustee, as AMEC has already admitted.  *See* Dkt. No. 256 ¶ 26 (p.7) ("AMEC Defendants admit that Dr. Harris is identified as a named Trustee of

---

[5] To the extent AMEC intends to suggest that Newport *should* have provided the Church with information or make affirmative disclosures of some type, the claim would still fail.  "[T]he tort of negligent misrepresentation does not apply to the failure to provide information, but to the disclosure of information." *Blake v. Mindshare Techs., Inc.*, No. 6:19-cv-02075, 2021 WL 9624582, *7 (N.D. Iowa Mar. 4, 2021) (applying Restatement (Second) of Torts § 552).

the Annuity Plan."). AMEC's argument that they actually *intended* to have multiple trustees is not only irrelevant, it does not even make sense. *See* SACC ¶¶ 68-69. AMEC has been in possession of the Plan document since inception. Yet, in the nearly two decades since then, it has apparently never sought to amend the Plan or add new trustees. Tellingly, AMEC repeatedly elected Dr. Harris (and Harris alone) to serve as the Executive Director of AMEC's Department of Retirement Services—which, as AMEC puts it, is the person "tasked with administering" and "giving oversight" to the Plan—for two decades. SACC ¶ 21. And during that twenty-year period, Dr. Harris (and no other purported trustee) reported on the Plan's investments. SACC ¶ 24.

Even if AMEC could muster up a single misrepresentation that Newport provided the Church, it does not identify any business decision or transaction guided by such information. "The requirement that the misrepresentation was made 'for the guidance of others in their business transactions' is an essential element of the tort of negligent misrepresentation." *Batten v. Cmty. Tr. & Banking Co.*, No. E201700279COAR3CV, 2019 WL 4013719, at *24 (Tenn. Ct. App. Aug. 26, 2019). Although Newport identified this issue in response to AMEC's original cross-complaint and AMEC's first amended-cross complaint, the SACC still omits this "essential element." Instead, AMEC merely recites the elements of the claim, alleging that Newport and others "supplied false information to AMEC meant to guide its business transactions." SACC ¶ 376. AMEC's "formulaic recitation of the elements . . . will not do." *Twombly*, 550 U.S. at 555.

## B. Newport reasonably relied on information from AMEC, not the other way around.

AMEC also has not adequately alleged that Newport failed to "exercise reasonable care in obtaining or communicating the information" AMEC supposedly received. *King*, 2022 WL 678568, at *4 ("[Plaintiff] must prove… the defendant did not exercise reasonable care in obtaining or communicating the information."). Even assuming Newport "failed to verify whether

15

valuations of Department and/or Annuity Plan investments in Motorskill Entities as reported to Newport were accurate," ***AMEC was the source of that allegedly faulty information***. SACC ¶ 378. AMEC cannot plausibly allege that Newport failed to exercise reasonable care in using information AMEC's own employee was providing. Moreover, Newport's Service Agreement expressly disclaims any duty to perform independent verification. *See* Dkt. No. 100-3 at PAGEID 970 ("We will assume all employee and asset data provided by the company to be accurate and thus we have no responsibility to make independent investigation to corroborate such information."). Newport cannot have acted negligently for doing what the Service Agreement says. *Cf. Conopco, Inc. v. Allen & Hoshall*, No. 01–2784 Ma/A, 2003 WL 25682114, at *10 (W.D. Tenn. Aug. 22, 2003) (finding, in context of claim against architect, that "[i]t is clear from the law of other jurisdictions . . . that [a professional's] liability for professional negligence in tort is inextricably linked to the duties it has assumed by contract."); *Tekman v. Berkowitz*, 639 F. App'x 801, 804 (3d Cir. 2016) (finding, in context of negligence claim against accountant, that "the scope of the [professional's] duty is defined primarily be the terms of contract").

### C. AMEC does not plausibly allege its reliance on any information it received from Newport was justified.

AMEC's negligent misrepresentation claim faces another hurdle—there are no plausible allegations that AMEC's reliance on any information it received from Newport was justifiable. *King*, 2022 WL 678568, at *4 ("[Plaintiff] must prove… plaintiff justifiably relied on the information."); *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005) ("The burden is not upon the defendant to show that it was not negligent, but rather, the burden is upon the plaintiff to show that its reliance upon any statements defendants may have made was reasonable.").

While AMEC attempts to fault Newport for failing to uncover Dr. Harris's alleged fraud or perform its own independent valuation of the Plan's investments, their claim is undercut by the

16

terms of the Service Agreement.  *See* Dkt. No. 100-3 at PAGEID 970.  Importantly, AMEC does not allege Newport erred in calculating asset information based on the information Newport was provided.  Instead, AMEC alleges that the information Newport received from AMEC was faulty from the outset.

But if anyone had the obligation to ensure that the Plan's assets and investments on which Newport's calculations were based were properly valued, it was ***AMEC*** and its employee ***Dr. Harris***, the Plan's trustee, in concert with the Plan's investment advisor and/or auditor—not Newport.  *See* Dkt 74-1, Plan Doc. at §§ 7.1-7.3 (for example, Section 7.1(a)(1) provides that the Trustee shall "invest, manage and control the Plan assets," and Section 7.2(a) provides that the "Trustee shall at all times in making investments of the Trust Fund consider, among other factors, the short and long-term financial needs of the Plan on the basis of information furnished by the Employer"); *id.* § 9.11 ("The Trustee shall have the sole responsibility of management of the assets held under the Trust. . . .").

And while AMEC points to the failure of Motorskill to provide statements to its employee (who in turn failed to provide them to Newport), that "fact" was or should have been known by AMEC.  Under Tennessee law, "a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within its reach."  *King*, 2022 WL 678568, at \*5-6.  AMEC had not just an equal opportunity—it had a ***better*** opportunity than Newport to uncover the alleged embezzlement scheme.  AMEC obviously had access to the same investment information that AMEC itself was providing to Newport, and the alleged mastermind behind the scheme was AMEC's own employee that it should have been supervising.  That AMEC purportedly "discovered that Harris" was engaged in a purported scheme to defraud the Plan after Dr. Harris retired underscores that AMEC "ha[d] access and opportunity to discover

17

the truth with respect to the misrepresented issue."  SACC ¶ 1; *King*, 2022 WL 678568, at *5.

AMEC's "fail[ure] to inform [itself] of the truth" for 20 years means "[it] must abide the

consequences of [its] own inattention."  *Id.* (cleaned up).

## IV.   AMEC Fails To State A Claim For Aiding And Abetting A Fiduciary Breach (Count X).

Count X alleges that Newport "provided substantial assistance or encouragement to Harris

and Eaton in their breaches of fiduciary duty[.]"  SACC ¶ 436.  This claim fails as a matter of law

for many of the same reasons discussed above in connection with AMEC's other claims.

To state a claim for aiding and abetting a fiduciary breach, AMEC must establish two

things: (i) that Newport "knew that [Dr. Harris and Robert Eaton's] conduct constituted a breach

of duty"; and (ii) that Newport "gave substantial assistance or encouragement to them in their

acts."  *Mark IV Enterprises, Inc. v. Bank of Am., N.A.*, No. M2017-00965-COA-R3-CV, 2018 WL

3146305, at *2 (Tenn. Ct. App. June 26, 2018) (citations omitted).  Importantly, aiding and abetting

"requires affirmative conduct," and the "[f]ailure to act or mere presence during the commission

of a tort is insufficient for tort accomplice liability."  *Id.*; *see also* Restatement (Second) of Torts

§ 876 ("For harm resulting to a third person from the tortious conduct of another, a person is liable

if he: (a) orders or induces such conduct, knowing of the conditions under which the act is done or

intending the consequences which ensue, or (b) knows that the other's conduct constitutes a breach

of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c)

gives substantial assistance to the other in accomplishing a tortious result and his own conduct,

separately considered, constitutes a breach of duty to the third person.").

***First***, nothing in the SACC plausibly suggests that Newport **knew** Dr. Harris or Robert

Eaton were breaching any fiduciary duties.  Simply declaring that Newport, and multiple other

Defendants, "knew" Dr. Harris and Robert Eaton were "[e]ngaging in a long-term pattern of

18

financial mismanagement, embezzlement, fraud, and misrepresentations" or engaged in wrongdoing is not enough. SACC ¶ 435. AMEC must plead **facts**, as opposed to conclusory allegations, to support their claim. *Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

The requirement of pleading facts showing knowledge is all the more important in the context of this case—AMEC alleges that Newport aided Dr. Harris and Robert Eaton in a nearly two-decades long fraud. Yet, there are no allegations that Newport had any relationship with any of the various corporate entities involved in Dr. Harris's purported scheme, had any authority to manage or direct Plan investments, or directed Plan moneys to be used for any improper purpose. To show that **Newport** aided the alleged breaches, AMEC must establish that Newport possessed knowledge of the breach and encouraged them to occur. Even accepting as true the allegations in the SACC, nothing suggests Newport was aware of Dr. Harris's or Robert Eaton's alleged scheme. At best, all the SACC alleges is that Newport, one of the Plan's service providers, (unsurprisingly) possessed some Plan information and knew about the existence of Plan investments after the decision to invest had already been made. That is a far cry from knowledge that Dr. Harris or Robert Eaton were engaged in embezzlement or otherwise breaching fiduciary duties.

**Second**, even if Newport possessed information, AMEC cannot plausibly allege Newport provided "substantial assistance" in any alleged breach. In the context of an aiding and abetting claim, "substantial assistance" requires something more than the provision of "routine professional services." *See El Camino Resources, LTD v. Huntington Nat. Bank*, 722 F. Supp. 2d 875, 911 (W.D. Mich. 2010), aff'd 712 F.3d 917 (6th Cir. 2013). While AMEC makes the conclusory

19

assertion that Newport "substantially assisted or encouraged Harris and Eaton," the allegations reveal nothing more than the provision of routine services pursuant to Newport's Service Agreement.  SACC ¶ 441.  AMEC again focuses on Newport's supposed failure to independently verify the Plan's investments in Motorskill and fault Newport for accepting information from Dr. Harris.  But as explained above, ***Newport was not an investment advisor and was contractually entitled to rely on the investment information it received from AMEC without independent verification***.  Nothing Newport did provided affirmative assistance to Dr. Harris or Robert Eaton. Newport did not design the complex web of corporate entities Dr. Harris and Robert Eaton allegedly relied upon, decide how or where to invest the Plan's funds, or agree to independently value the Plan's investments and monitor Dr. Harris.

At bottom, AMEC faults Newport for not uncovering or preventing Dr. Harris and Robert Eaton's alleged fraud.  This was clearly not Newport's role, and AMEC's "vague instance[s] of inaction or failures to act . . . are insufficient to state a claim for aiding and abetting under Tennessee law."  *Mark IV Enterprises, Inc.*, 2018 WL 3146305, at *3.  Even if Newport "fail[ed] to act" and was present "during the commission" of the alleged fraud—neither of which AMEC plausibly alleges—aiding and abetting requires more.  *Id.* at *2 (dismissing aiding and abetting claim).

## CONCLUSION

For the reasons above, Newport respectfully request that the Court grant this Motion and dismiss Counts III, IV, V, VI, VII, and X against Newport in the SACC with prejudice.

Dated: December 19, 2024

Respectfully submitted,

*/s/ Mark C. Nielsen*
Lars C. Golumbic
Mark C. Nielsen
Edward J. Meehan
Shaun A. Gates
Larry M. Blocho Jr.
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, NW
Washington, D.C. 20006
Phone: (202) 857-0620
Email: lgolumbic@groom.com
      mnielsen@groom.com
      emeehan@groom.com
      sgates@groom.com
      lblocho@groom.com

*Counsel for Defendant/Cross-Defendant
Newport Group, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2024, a true and correct copy of the foregoing

pleading was sent to all counsel of record via the CM/ECF system.

*/s/ Mark C. Nielsen*

Mark C. Nielsen